**Evan L. RICHARDS**

v.

**CABLE NEWS NETWORK, INC.**

**Civil Action No. 98–3165.**

United States District Court,
E.D. Pennsylvania.

July 28, 1998.

Lawrence E. Feldman, Jenkintown, PA, for Plaintiff.

Martin J. Black, Samuel E. Klein, Eric M. Schweiker, Dechert Price & Rhoads, Philadelphia, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff, Evan L. Richards ("Richards"), known in the reggae music world as "Richard Ace," is the owner of a registered trademark of the name WORLD BEAT for his record company. Richards seeks preliminary relief enjoining defendant Cable News Network,

Inc. ("CNN") from allegedly infringing upon his trademark by using WORLD BEAT as a title for CNN's new weekly international music program, as well as for a portion of CNN's site on the World Wide Web.

This Memorandum will constitute our Rule 52(a) findings of fact and conclusions of law on plaintiff's motion for a temporary restraining order and preliminary injunction. We held a hearing on the motion on July 23 and 24. For the reasons set forth below, we will deny plaintiff's motion.

*Background*

CNN is a cable television network, available in seventy-three million households in the United States and Canada. Cable News Network International ("CNNI") is an international cable television network, available in more than 135 million households in 210 countries. *See* Declaration of Christopher Cramer at ¶¶ 2–3; *see also* N.T. 107–09.[1] In early 1997, CNNI began developing a television feature program called WORLD BEAT to cover music news from around the world.[2] As Mr. Cramer describes it,

> The show features in-depth profiles with prominent artists from around the world, comprehensive music news and global tour itineraries. The show is not limited to what many consumers might commonly refer to as WORLD BEAT type music, and instead covers a broad range of news and events in the music world.

Declaration of Chris Cramer ¶ 7.

The videotape of the inaugural WORLD BEAT program of June 6, 1998, which we saw as Defendant's Ex. 2, bears out Mr. Cramer's description.[3] Since the program is the Hamlet of this drama, we will set forth in some detail the video we saw. There is nothing in the record to suggest that this video was an unrepresentative exemplar of the program.

The host of WORLD BEAT, Brooke Alexander, described it as "the first global music news show" as she stood on a balcony in Havana, Cuba, the focus venue of this premier broadcast. The program shows in detail the "kaleidoscopic musical heritage" of Cuba, and features Havana's Buena Vista Social Club and the (said to be) legendary Cuban pianist, Ruben Gonzalez, 77.

After perhaps ten minutes in Cuba, there is a segment called "The Beat," covering recent news from the musical world such as the merger of PolyGram Records into Seagram. This segment also mentions the departure of Geri Halliwell, more familiarly (and formerly) known as Ginger Spice, from the popular British musical group, the Spice Girls.

At last, there is a break for a commercial. The Swedish motor company, Volvo, is the show's primary worldwide sponsor. Mr. Cramer testified that Volvo has signed a contract with CNNI to serve in that advertising role each week for three years. N.T. 127.

After the commercial, the program returns to a listing of "Top 10" popular songs, which shows clips of music videos of the top 10 songs worldwide (a list compiled by an independent agency). Prominently featured is the Celine Dion theme from *Titanic*, whose album, the viewer is told, sold twenty million copies worldwide.

The program then moves to a segment entitled, "On the Flip Side," which in the inaugural broadcast featured the Ivor Novello Music Awards, given annually in London to songwriters. At a London site of the awards, "Flip Side" interviews a number of well-known musical figures, including Elton John, whose "Candle in the Wind" was noted as being the biggest-selling single in history. Relevant to the enterprise before us, Sir Tim Rice mentions that "The whole world sings in English," certainly since the time of the Bea-

---

1. We clarified at the hearing that CNN, CNN International, and CNN Interactive (which operates the Web site) are all fictitious names of divisions of Cable News Network, Inc.

2. Christopher Cramer, CNNI's President, testified that CNNI airs its WORLD BEAT program in the United States at 12:00 a.m. E.D.T. on Saturday and Sunday at 3:30 p.m. In Europe, Asia, and Latin America CNNI airs its WORLD BEAT program in prime time.

3. Notably, plaintiff admitted in his testimony that he never bothered to watch this or any other broadcast of WORLD BEAT. N.T. 99.

tles, and Sting also appears in an interview echoing Sir Tim's observations. As an aside, it would seem that the English language's pervasiveness in the musical world facilitates the production and worldwide dissemination of a program like WORLD BEAT.

After segments entitled "Global Gigs"—identifying important concerts around the world in the upcoming week—and "Fresh Cuts"—featuring latest releases worldwide, e.g., Anggun, a fresh face from Indonesia who sings in perfect English as well as French and Indonesian—the program returns to Cuba for its finale, followed by a brief "Fast Forward" of clips from the next week's show, to feature music on the World Cup competition then about to begin in France and the upcoming Led Zeppelin tour. The program's last moments show figures such as Elton John and Wynton Marsalis saying, "See me on World Beat on CNN" and "[I'm] in tune with World Beat."

The title WORLD BEAT is thus a triple entendre. The title conveys first a well-known international music genre—known variously as "world", "world music", and "world beat"[4]—recognized by the type of international audiences who watch CNNI. See Cramer Declaration at ¶ 6. Second, the title refers to the program's journalistic "beat", which every week covers the music news of the entire world; as such, the program is not limited to the "world beat" genre of music, but instead covers a broad range of news and events in international music, such as the Seagram/PolyGram merger and the Ivor Novello Awards. Third, the title is a metaphor for the musical heartbeat of the globe.

CNN Interactive maintains a "cnn.com" site on the World Wide Web. Within that site is a subsite using the name WORLD BEAT to refer to its television program as well as to provide a variety of international music information. See http:// www.cnn.com/WorldBeat; see also Ex. B to plaintiff's motion and Plaintiff's Ex. 11 (World Beat "Global Top 30"). Plaintiff in closing argument took particular offense at the Web site because of the as-yet unplanned possibility that this site could easily be reprogrammed to place hyperlinks[5] at all of the recordings cited in its Top 30 array.[6]

CNN does not sell pre-recorded audiotapes, records, or CD's using the name WORLD BEAT either on its television show or its Web site. See Cramer Declaration at ¶ 9. Mr. Cramer stressed in his testimony that such advertising on either the television show or the Web site would be "editorially unacceptable" because it would contravene strong policy at CNNI as well as the guidelines of the United Kingdom's Independent Television Commission, a licensing agency for the television show.[7] See N.T. 122–23.

Plaintiff Richards is a musician who was classically trained at the Royal School of Music in London. After tutelage at Studio One in Jamaica with the great Jamaican

---

4. See e.g., Plaintiff's ex. 1 (*Billboard* magazine) and Joint Ex. 1, Timothy D. Taylor, *Global Pop* at 4 (1997) ("World Beat is a fascinating new mechanism which enables traditional music to again play the prominent role it historically has had in rejuvenating the world's popular music."); *see also id.,* frontispiece comments by the University of Pennsylvania's Gary Tomlinson, plaintiff's own expert (" -- the dizzying varieties of world beat....") as well as the index to the book (using "World Music" and "World Beat" interchangeably). *See also Random House Webster's College Dictionary* at 1482 (1998), defining *world beat* as "n. (*sometimes caps* ) any of various styles of popular music combining traditional, indigenous forms with elements of another culture's music" and *world music* as "1. WORLD BEAT. 2. traditional music of a usu. non-Western culture."

5. Hyperlinks are described in Finding 33 in *American Civil Liberties Union v. Reno,* 929 F.Supp. 824, 836 (E.D.Pa.1996), *aff'd* — U.S., ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The World Wide Web and its operation are described at length at *id.,* Findings 33–48, 929 F.Supp. at 836–838.

6. No evidence was presented that CNN planned to sell cassette tapes, records, or CD's using the interactive Web site. Plaintiff's suggestion that we enjoin CNN Interactive from using the Web site for such hypothetical activities is thus not ripe for our review.

7. Those concerns outweigh the hypothetical "conflict" Richards identifies as arising from the uncontested reality that Time–Warner owns both CNN and Reprise/Warner Brothers records. Mr. Cramer testified that there was no connection between Reprise/Warner Brothers records and the WORLD BEAT television program or WORLD BEAT Web site.

reggae pioneer, Bob Marley (who died in 1981), Mr. Richards came to Philadelphia and has for years headed a reggae band called "Sons of Ace." He is also the sole proprietor of a business known as "World Beat Records and Tapes." Under the name Evan L. Richards "d/b/a World Beat Records & Tapes," it is undisputed that plaintiff obtained from the Patent and Trademark Office a federal registration for his record label in the field of "pre-recorded audio cassette tapes, phonograph records, and compact discs." *See* Complaint Exhibit A (Registration No. 1,569,393, registered December 5, 1989).[8] Plaintiff's registered trademark consists of a logo comprising a picture of a globe wearing headphones and balanced on top of the phrase, WORLD BEAT.[9] *See id.* Richards testified that his WORLD BEAT record label sells only reggae music and (contrary to the weight of the evidence) that the general public only knows the name WORLD BEAT as his record label, not as a genre of music.[10]

■ Mr. Richards on June 18, 1998 filed a four count complaint alleging federal trademark infringement in violation of 15 U.S.C. § 1114(1) (Count I), federal unfair competition in violation of 15 U.S.C. § 1125(a) (Count II), common law trademark and tradename infringement (Count III), and a violation of the Pennsylvania Unfair and De-

ceptive Trade Practices Act (Count IV).[11] He seeks a preliminary injunction ordering CNN to stop using the name WORLD BEAT in connection with its news program and within CNN's Web site.[12]

*Legal Analysis*

In order to prevail on a motion for preliminary injunction, plaintiff must establish: (1) the likelihood that he will prevail on the merits at a final hearing, (2) the extent to which he is being irreparably harmed by CNN's conduct, (3) the extent to which CNN will suffer irreparable harm if the preliminary injunction is issued, and (4) that granting relief is in the public interest. *See Duraco Prods. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1438 (3d Cir.1994); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*, 963 F.2d 628, 632–33 (3d Cir.1992).

**I.** *Likelihood of Success on the Merits*

■ To establish a claim of trademark infringement, it is well-settled that a plaintiff must show that: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fisons Horti-*

---

**8.** It is also undisputed that plaintiff's trademark is now incontestable.

**9.** Richards confirmed at the hearing that he is not suing for infringement of his logo, but only for CNN's use of the name WORLD BEAT. N.T. 65–66.

**10.** At oral argument, plaintiff's counsel conceded that there are members of the general public who use the name WORLD BEAT to describe a genre of music. Plaintiff's counsel argued, however, that the use of the term WORLD BEAT to describe a genre of music is passé, and that the more common term today is "World Music" or simply "World." As we observe in n. 4, *supra*, a 1998 dictionary uses *world beat* and *world music* as synonyms.

**11.** Plaintiff's complaint essentially amounts to a "reverse confusion" case. "Reverse confusion" occurs when a larger, more powerful junior user infringes on the trademark of a smaller, less powerful senior user, causing confusion as to the source of the senior user's goods and services because the junior user saturates the market with a similar trademark and overwhelms the senior

user's product. *See Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 474–75 (3d Cir.1994) (adopting the doctrine of reverse confusion).

The Lanham Act, the common law of trademark and tradename infringement, and the Pennsylvania unfair competition statute are similar, except that the federal statute requires that the products move in interstate commerce. *See Environ Products, Inc. v. Furon Co., Inc.*, Civ. No. 96–2451, 1998 WL 398074, at *3 (E.D.Pa. June 26, 1998); *J & M Turner, Inc. v. Applied Bolting Technology Prods., Inc.*, Civ. No. 95–2179, 1998 WL 47379 at *8 (Jan. 30, 1998); *Smithkline Beckman Corp. v. Pennex Prods. Co., Inc.*, 605 F.Supp. 746, 748 n. 1 (E.D.Pa.1985). Accordingly, we will not distinguish these causes of action for purposes of our analysis.

**12.** As we held a hearing after notice to CNN, and as Richards filed his motion a month after filing his complaint, we only address Richards's motion under preliminary injunction standards. *See* Fed.R.Civ.P. 65(b). At the hearing, plaintiff withdrew his request for a temporary restraining order.

culture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 472 (3d Cir.1994).

Richards meets the first two elements because his mark is both registered and incontestable.[13] This reality does not, however, give plaintiff the monopoly he seems to believe he has on the name WORLD BEAT. Therefore, before we reach the third element (likelihood of confusion), we must explore the scope of Richards's registration, as he overstates the value of his registration and its incontestable status.

### A. The Scope of Plaintiff's Registration

In National Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383 (3d Cir.1985), our Court of Appeals followed the Second Circuit's lead in holding that a registered mark is limited "to only the specific terms of the registration so as to allow parties interested in marketing products with a new mark to rely as fully as possible on the registry." Id. at 1396, citing Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 48 (2d Cir. 1978) and Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 613 n. 7 (2d Cir.1960). The rationale behind this opinion was that the grant of a monopoly over a trademark/tradename should not be liberally construed and should not be extended unless the owner is clearly entitled to protection. See id.

Richards's WORLD BEAT registration on its face covers the production, sale, and distribution of "pre-recorded audio cassette tapes, phonograph records, and compact discs." See Complaint Ex. A (Registration No. 1,569,393, registered December 5, 1989). Therefore, the impact and scope of plaintiff's registration must be strictly limited to pre-recorded music. Our limited construction of the scope of Richards's registration appears to coincide with the actions of the Patent and Trademark Office ("the PTO") after Richards received his '393 registration in late 1989. Since Richards received his registration, the PTO has issued at least four other trademark registrations for the name WORLD BEAT:

- Jostens, Inc. holds a registration for the mark WORLD BEAT for a "magazine that is inserted in scholastic yearbooks featuring full color photographs and commentary on events that happened during the year." Defendant's Ex. 1–D.[14]

- Latin Percussions, Inc. holds two registrations for the name WORLD BEAT, first, for the mark WORLD BEAT for "percussion musical instruments" and, second, for the mark WORLD BEAT PERCUSSION for "musical instruments; namely, percussion instruments, bells, tambourines, drum mounts, brackets for instruments, instrument stands, rainsticks, chimes, instrument wheels, drum sticks, castanets, whistles, which are specifically designed as musical instruments, thumb pianos, cymbals, bags which are fitted to carry specific musical instruments." Defendant's Ex. 1–D.

- Reggaerobics, Inc. holds a registration for the mark WORLD BEAT WORKOUT for "Men's, women's and children's clothing; namely, t-shirts, leggings, tights, leotards, sweatshirts, sweatpants, shirts and bike shorts." Defendant's Ex. 1–D.

In his testimony, Mr. Richards stated that he did not object to the existence of other these other businesses using the name WORLD BEAT because, "as long as they don't sell [ ] records, they are not in my line of commerce." N.T. at 103. Based on the evidence presented that CNN does not produce or sell any records, tapes, or CD's either on its WORLD BEAT television show or through its interactive Web site, we are only left to speculate as to why Richards brought this suit against CNN.

---

13. "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no adverse decision concerning the registrant's ownership or right to registration." Fisons, 30 F.3d at 472, n. 7.

14. Jostens' WORLD BEAT magazine is a sixteen-page glossy magazine containing segments on "World News", "National News", "Science News", "Faces in the News", "Entertainment News", "Sports News", "Lifestyle News"; it also contains a two-page section on "Music News." See Plaintiff's Ex. 14.

At oral argument, plaintiff's counsel conceded that CNN was not in the business of selling pre-recorded music. He argued, however, that the WORLD BEAT program was music entertainment, like MTV or VH-1 and, as such, created a likelihood of confusion with plaintiff's WORLD BEAT music label. Before now turning to the test for likelihood of confusion, we note that the impact and scope of plaintiff's registration is very narrow and does not encompass CNN's use of the mark WORLD BEAT.[15]

## B. *Likelihood of Confusion*

■ Richards bears the burden of establishing that CNN's use of the mark WORLD BEAT will create a likelihood of confusion. *See Fisons*, 30 F.3d at 472. The weight of proof Richards must marshall for this requirement depends on whether the goods or services offered by Richards and CNN are competitive or noncompetitive. *See id.* at 472–73.[16] Where, as here, the goods are not in direct competition, the similarity of the marks is only one of many factors we must examine to determine likelihood of confusion. *See Fisons*, 30 F.3d at 473.

To determine likelihood of confusion where the plaintiff and defendant deal in non-competing lines of goods or services, the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold. The closer the relationship between the products, and the more similar their sales contexts, the greater the likelihood of confusion. Once a trademark owner demonstrates the likelihood of confusion, it is entitled to injunctive relief.

*Interpace Corp. v. Lapp Inc.*, 721 F.2d 460, 462 (3d Cir.1983) (citations omitted).[17]

■ Our Court of Appeals has adopted a ten-factor test to determine likelihood of confusion in the market place as to a product's source in cases of alleged trademark infringement and unfair competition by a producer of a non-competing product. *See Fisons*, 30 F.3d at 473–74; *Dranoff–Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862–63 (3d Cir.1992); and *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 293 (3d Cir. 1991). These factors are:

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

---

**15.** Without even reaching the issue of likelihood of confusion, we could find plaintiff is not likely to succeed on the merits of his trademark infringement claim because his registration for the mark WORLD BEAT does not extend to cover CNN's music news program and interactive Web site. *See, e.g., Moore Push–Pin Co. v. Moore Business Forms, Inc.*, 678 F.Supp. 113, 116–17 (E.D.Pa.1987) (holding that neither Moore Push-Pin Company nor Moore Business Forms, Inc. were entitled to a preliminary injunction because the products marketed by each company under the name MOORE were not similar and that the scope of Moore Business Forms' registration did not extend to Moore Push–Pin's products).

**16.** If the action involves competing goods, "the court need rarely look beyond the mark itself."

*Interpace Corp. v. Lapp, Inc. .*, 721 F.2d 460, 462 (3d Cir.1983). In those cases, the court focuses on the marks to determine if they are "confusingly similar." *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1063 (3d Cir.1991).

**17.** In a reverse confusion case we apply the same test for likelihood of confusion as in a direct confusion case. *See Fisons*, 30 F.3d at 475 (adopting the doctrine of reverse confusion). Furthermore, because Richards has brought his federal claims pursuant to sections 32 and 43(a) of the Lanham Act for trademark infringement and unfair competition, 15 U.S.C. §§ 1114(1) and 1125(a), plaintiff need not provide proof of actual confusion, but only show likelihood of confusion. *See id.* at n. 11.

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods [or services] in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Fisons*, 30 F.3d at 473–74. We must weigh each factor separately to determine whether a likelihood of confusion exists. *See id.* at 481–82. In *Fisons*, our Court of Appeals stated that not all of the factors must be given equal weight, and the weight given to each factor, as well as the overall weighing of the factors, must be done on a fact-specific basis. *See id.* at 474, n. 11. Furthermore, *Fisons* instructs that not all of the factors are applicable to every case, and that the factors are not necessarily ranked in order of importance. *See id.* Accordingly, we will address the factors in this case in a slightly different order, due to the particular facts of this case.

## Similarity of Goods and Services (Factor 9)

The similarity of the goods or services offered by the parties here is the most important factor regarding the existence of any likelihood of confusion. Our Court of Appeals has stated that the test for this factor is whether the goods or services are similar enough that a consumer could assume they were offered by the same source. *See Fisons*, 30 F.3d at 481.

Plaintiff's WORLD BEAT label is used only for the production and sale of a very distinct style of music—reggae music—in the form of pre-recorded cassette tapes, records and CD's. CNN, on the other hand, uses the mark WORLD BEAT as the name of a music news program and informational Web site covering music-related stories from all over the world. It is important to note that while Richards sells a specific product to the consumer (pre-recorded reggae music), CNN provides a broad-based informational service to the consumer and does not explicitly sell any product. While the marks are thus both in the same general field of music, they are not sufficiently similar to create a likelihood of confusion. *See, e.g., Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc.,* 952 F.Supp. 1084 (D.N.J.1997) (holding that the concurrent use of the mark WIZARDS between a "show" basketball team and a professional basketball team did not create a likelihood of confusion because there were meaningful differences between the products and services); *Sunenblick v. Harrell,* 895 F.Supp. 616 (S.D.N.Y.1995) (holding that there was no reverse confusion between jazz records and hip-hop records sold under the identical mark UPTOWN RECORDS because although the recordings were musical products, they were marketed to different consumers and sold in separate sections of record stores); *Swanson v. Georgetown Collection, Inc.,* Civ. No. 94–1283, 1995 WL 72717 (N.D.N.Y. Feb.14, 1995) (holding that reverse confusion was unlikely between the mark FAR AWAY FRIENDS for porcelain dolls and FAR AWAY FRIENDS for cloth dolls); *Taj Mahal Enterprises, Ltd. v. Trump,* 745 F.Supp. 240 (D.N.J.1990) (holding that the differences in services offered by plaintiff, a restaurant serving Indian cuisine, and those of defendant, Donald Trump's Atlantic City hotel and casino, were sufficiently different in services such that no trademark infringement had occurred or would occur).

## Similarity of the Marks (Factor 1)

In considering the similarities between two marks, our Court of Appeals directs us to look at the overall impression the marks created, rather than simply undertake a side-by-side comparison. *See Fisons,* 30 F.3d at 477–78. Marks are "confusingly similar if ordinary consumers would likely conclude that ... [the products or services] share a common source, affiliation, connection or sponsorship." *Id.* at 477.

While Richards and CNN use an identical tradename, plaintiff's counsel conceded at the beginning of the hearing that his client's logo (a picture of a globe wearing headphones balanced on the top of the phrase WORLD BEAT) is not similar to CNN's logo. As such, the use of dissimilar designs diminishes the likelihood of confusion. *See* 3 J. McCar-

thy on Trademarks and Unfair Competition § 23.15[5]. We also note that the use of WORLD BEAT by each of the parties is intended to carry a very different meaning. *See id.* at § 23.08 ("Similarity is not limited to the eye or ear. The mental impact of a similarity of meaning may be so pervasive as to outweigh any visual or phonetic differences.") While plaintiff's WORLD BEAT name is supposed to connote a particular reggae record label, CNN's use of the mark WORLD BEAT is, as noted above, a triple *entendre,* intended to connote, first, a particular genre of music, second, that the show's journalistic "beat" is the world and, third, the metaphoric heartbeat of the world. Accordingly, when comparing the two marks in their totality, we find that this factor weighs against Richards.

### The Strength of the Owner's Mark (Factor 2)

Richards has shown that his mark, as it pertains to the production and sale of pre-recorded tapes, records, and CD's, is relatively strong. *See Fisons,* 30 F.3d at 478 (explaining that the fact that a word is common does not necessarily make it weak, but whether the way the word is used in a particular context is unique). First, it is undisputed that his mark is registered and incontestable for pre-recorded music. Second, at the hearing Richards introduced evidence showing two different occasions when he enforced his mark against other record companies. *See* Plaintiff's Ex. 2 (showing settlement agreement in C.A. No. 90–6780 (E.D.Pa.) with Randall Grass to cease and desist from using WORLD BEAT in connection with the "production, sale, promotion, or distribution ... [of] pre-recorded audio cassette tapes, phonograph records, and compact disks."), and Plaintiff's Ex. 10 (offered to show enforcement against Insignia Records).

The problem here is that Richards appears to be trying to extend the protections for his trademark beyond pre-recorded music into the more general category of music news and entertainment. In this broader category, plaintiff's mark is weak. Aside from the

other registered trademarks for the name WORLD BEAT, at the hearing we reviewed many articles, trade publications, newspapers, and Web sites where WORLD BEAT was used to describe a genre of music. *See* Defendant's Exhibit 1A–B, Declaration of Melissa J. Homestead, Plaintiff's Exhibit 9–A (listing Web sites); *see also infra* (holding that WORLD BEAT is generic as applied to a genre of music). Furthermore, at the hearing, we without objection took judicial notice of:

- A Web site for Fastlane International, a company which represents at least twelve "World Beat Artists." *See* http://www.fastlaneintl.com.

- A Web site for "World Beat Alliance," which describes itself as a weekly Web publication dedicated to improving understanding of major market radio. *See* http://www.worldbeatalliance.com.

- A Web site for "World Beat Tours" which arranges travel packages to music festivals world wide. *See* http://www.worldbeattours.com.

- The fact that Balboa Park in San Diego, California has a "World Beat Center" which holds concerts and festivals.

- The fact that Salem, Oregon just recently held the "Salem World Beat Festival" on June 27–28, 1998, which was described as a "multi-cultural festival."[18]

While our Court of Appeals has observed that the weakness of a senior user's mark in a reverse confusion case should not be too heavily emphasized, it has also held that a mark's inherent distinctiveness is of great importance and has also recognized that commercial strength is an important factor to consider. *See Fisons,* 30 F.3d at 478–79. Here, where the term WORLD BEAT is used widely in relation to the field of music and is generic to describe a genre of music, *see infra,* we find that plaintiff's mark is weak and not likely to be confused with CNN's use of the mark for music news services.

---

18. We afforded both sides the opportunity to confirm these on-line realities, and plaintiff's counsel, after doing the searches himself, did not dispute these results.

### Actual Confusion (Factors 4 & 6)[19]

It is well-established that plaintiff need not present evidence of actual confusion in this case, but need only show likelihood of confusion. Our Court of Appeals has also noted that lack of actual confusion does not raise an inference that there is no *likelihood* of confusion. *See Versa Prods. Co. v. Bifold Co. Ltd.*, 50 F.3d 189, 205 (3d Cir.1995). The only evidence Richards presented was that a friend said to be named "Bill" allegedly called plaintiff with the news: "You're rich now ... things [are] looking up" because Bill had seen the WORLD BEAT show on CNN and concluded that Richards must be getting royalties for the use of the name. N.T. 59. As such, plaintiff has presented no serious evidence of actual confusion.

### Defendant's Intent (Factor 5)

In a case of reverse confusion, our Court of Appeals directs us to consider a variety of considerations including: whether CNN conducted an adequate name search, whether it followed through with an investigation when it found other companies using the name WORLD BEAT, whether it considered the likelihood of confusion with other companies, and whether it was careless in the evaluation of likelihood of confusion. *See Fisons*, 30 F.3d at 480. The rationale behind these considerations is to determine whether CNN, as a more powerful junior user, intended to saturate the market and overwhelm plaintiff's senior mark.

Mr. Cramer testified that the name WORLD BEAT was chosen as a "half-pun," *see supra* (explaining the triple *entendre*), and that he did not want to use the word GLOBAL both because it was a somewhat pretentious two-syllable word and because there were other CNN shows using GLOBAL. Cramer also testified that, about four months before WORLD BEAT's premier, CNN's legal department undertook a name search for other companies, but that he did not become aware of the plaintiff or the WORLD BEAT record label until Richards filed his lawsuit. There is thus no evidence that CNN chose the name WORLD BEAT with an intent to overwhelm the plaintiff's tradename.

### Marketing and Advertising (Factor 7)

Richards and CNN do not share similar marketing and advertising. Unlike CNN, which reaches millions of homes across the world via cable television, Mr. Richards described himself as a "poor independent producer," who relies mainly on posters, newspapers, and radio to promote his goods.[20] A close comparison of the parties' marketing and advertising illustrates that the two parties share only one medium in common, the Internet. There is little question that the Internet levels the playing field for commercially-contending Davids and Goliaths. *See ACLU v. Reno*, 929 F.Supp. 824, 881 (E.D.Pa.1996) (noting that "[i]t is no exaggeration to conclude that the Internet has

19. We will not consider the third factor—the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase—as it does not appear to be relevant to our inquiry.

20. At the hearing, plaintiff introduced several samples of advertisements in newspapers for his band "Sons of Ace", *see* Plaintiff's Exs. 5–7, as well as a sample poster promoting "Richard Ace & Sons of Ace" and the WORLD BEAT record label, *see* Plaintiff's Ex. 12. The poster—whose image is reproduced on a CD, Plaintiff's Ex. 16—depicts the five members of the band, two of whom are wearing bright, rainbow colored "Stars of David." Richards testified that this Star of David is actually a symbol first derived from an Ethiopian sect of Jews called the Falashas.

His testimony on this point may be a bit fanciful. In the first place, *Falashas* has "pejorative connotations and is no longer used." R.J. Zwi Werblowsky and Geoffrey Wigoder, *The Oxford Dictionary of the Jewish Religion* at 119 (1997). Instead, *Beta Israel* is preferred, meaning "(House of Israel), the term by which Ethiopian Jews refer to themselves. Between 1977 and 1993, almost forty-five thousand Ethiopian Jews were brought to Israel. There is no Beta Israel community in Ethiopia today." *Id.* In fairness to Mr. Richards, the political incorrectness of *Falashas* did not prevent David Kessler from using that word as the title of his book, *The Falashas The Forgotten Jews of Ethiopia* (1982).

With respect to the "Star of David," there would appear to be little warrant for the multicolored shield in that shape that Mr. Richards and his sons use in association with the "Falashas." See *Oxford Dictionary of the Jewish Religion* at 433–34 (entry for *Magen David*); *but see* Kessler, *id.* at 13.

achieved, and continues to achieve, the most participatory marketplace of mass speech that this country—and indeed the world—has yet seen" and describing the "democratizing" effects of Internet communication because "individual citizens of limited means can speak to a worldwide audience on issues of concern to them."). At the hearing, however, Richards testified that his Web site is currently not in operation; more importantly, there was no evidence that Richards had in fact to date sold any record, tape or CD on the Internet.

### Targets of Parties' Sales Efforts (Factor 8)

While Richards offered no evidence of his target audience, based upon Mr. Cramer's description of the average CNNI audience member, we can assume for purposes of this motion that the target audiences for the WORLD BEAT record label and CNNI are quite different. Mr. Cramer testified that the average CNNI viewer is a middle or senior-level businessperson, age fifty or younger, affluent, well-educated, predominantly male, and interested in art, music, and breaking news. See N.T. 112. We harbor a suspicion that this is not the portrait of the average lover of reggae.

### Likelihood of Expansion (Factor 10)

Relevant to this inquiry, Mr. Richards testified that he was planning to open his own Web site and release a video in the near future. While plaintiff's re-entry onto the Internet would put him back in the same medium as CNN's interactive Web site, it still would not change the reality we have described. Mr. Cramer testified that CNN had no plans to market records, tapes, or CD's on the interactive Web site, N.T. 125, and that he would oppose such an activity as

"completely unacceptable". N.T. 126. This strongly-held view seems to insure that Richards and CNN will not be in direct competition in the foreseeable future.

Thus, upon a review of all ten factors, we find that CNN's use of the name WORLD BEAT for an international television music news program and an informational interactive Web site poses no likelihood of confusion to plaintiff's use of the name WORLD BEAT in the promotion and sale of pre-recorded reggae music.[21]

### C. *WORLD BEAT is Generic as a Genre of Music*

As Justice Holmes observed, "A word is not a crystal, transparent and unchanged, it is the skin of living thought and may vary greatly in color and context according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918). The term WORLD BEAT is a "multi-use" term that has a variety of meanings depending upon the context in which it is used. For example, Richards uses the term WORLD BEAT as a record label for reggae-type music. CNN uses the term WORLD BEAT as a "half-pun" intended to invoke three different levels of meaning. See supra. Similarly, Latin Percussions, Inc. use the term WORLD BEAT to sell percussion musical instruments. See Defendant's Exhibit 1–D.

The predominant use of WORLD BEAT is rather clearly as a genre of music. See *Random House Webster's College Dictionary* at 1482 (1998) (defining *world beat* as "n. *(sometimes caps)* any of various styles of popular music combining traditional, indigenous forms with elements of another culture's music").[22] *See also* Declaration of

---

**21.** The three cases plaintiff's counsel cited at oral argument are inapposite. In *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir.1977) and *Elizabeth Taylor Cosmetics Co., Inc. v. Annick Goutal, S.A.R.L.,* 673 F.Supp. 1238 (S.D.N.Y.1987), the parties were in direct competition over the same exact type of goods, namely perfume and tires. In *WSM, Inc. v. Bailey,* 297 F.Supp. 870 (M.D.Tenn.1969) the district court held that the use of the word OPRY as a label for Country and Western records the defendants manufactured was likely to be confused with plaintiff's use of its registered service

mark GRAND OLE OPRY, because plaintiff was a producer of shows featuring Country and Western music. If in this case CNN's WORLD BEAT television show only featured reggae-type music and, further, if CNN only showed videos (like VH–1 or MTV) of reggae music, rather than presenting the information in the format of a news program, we might be more inclined to follow the logic of *WSM.*

**22.** Richards takes issue with any reliance on this 1998 *Random House Webster's College Dictio-*

Melissa J. Homestead, Defendant's Exhibit 1–A and 1–B, (listing many articles in trade publications where WORLD BEAT was used to describe a genre of music); Plaintiff's Exhibit 9–A (listing Web sites using WORLD BEAT as a genre of music; Joint Ex. 1, Timothy D. Taylor, *Global Pop* at 4 (1997) ("World Beat is a fascinating new mechanism which enables traditional music to again play the prominent role it historically has had in rejuvenating the world's popular music."); *id.* at frontispiece (comments by the University of Pennsylvania's Gary Tomlinson, plaintiff's own expert, *e.g.,* ".. the dizzying varieties of world beat....."); Defendant's Exhibit 1–G (noting that three popular Internet music sellers—Amazon.com (Amazon Records and Books), dmxmusic.com (Digital Music Express), and musicchoice.com (Music Choice), all use WORLD BEAT on their Web sites to denote a genre of music; *see also* http://www.fastlaneintl.com (a Web site for Fastlane International, a company claiming to represent at least twelve "World Beat Artists"); http://www.worldbeatalliance.com (a Web site for "World Beat Alliance," which describes itself as a weekly Web publication dedicated to improving understanding of major market radio); http://www.worldbeattours.com (a Web site for "World Beat Tours" which arranges travel packages to music festivals world wide), as well as the fact that there is a "World Beat Center" in Balboa Park in San Diego, California which holds concerts and festivals; and a "Salem World Beat Festival" in Salem, Oregon, which was described as a "multi-cultural festival."[23]

In *Illinois High School Ass'n v. GTE Vantage, Inc.,* 99 F.3d 244 (7th Cir.1996), the Seventh Circuit was presented with a case involving the use of the term MARCH MADNESS in relationship to two different basketball tournaments (as well as to promote special discounts on automobile sales). The Illinois High School Association ("IHSA") sued a licensee of the NCAA for its use of term MARCH MADNESS. Apparently, the IHSA had been running a local basketball tournament since the 1940s called MARCH MADNESS. In 1982, when CBS began televising the "Final Four" NCAA championship basketball games, broadcaster Brent Musburger used the term "March Madness" to describe the tournament. The term caught on and the media and the public now use it to denote the NCAA's tournament as well as the IHSA's tournament. In concluding that MARCH MADNESS, as a "dual-use" or "multiple-use" term, was generic, Chief Judge Posner wrote: "A trademark owner is not allowed to withdraw from the public domain a name that the public is using to denote someone else's good or service, leaving that someone and his customers speechless." *Id.* at 247.

Similarly, the term WORLD BEAT is a "multi-use" term which, while used to denote a variety of different meanings, would seem to have become generic to describe a genre of music. Therefore, to the extent that CNN (or any other business or individual) invokes the term WORLD BEAT to denote a style or genre of music, such use could not be silenced under trademark law.[24]

---

*nary.* Instead, at the hearing plaintiff offered five paperback abridged dictionaries to show that WORLD BEAT was not defined in any of them. *See* N.T. 72–73. First, it is important to note that the plaintiff offered into evidence only abridged paperback dictionaries, rather than the hardbound (and more comprehensive) *Random House Webster's College Dictionary.* All of plaintiff's dictionaries are copyrighted before 1998, a relevant fact since we are presented here with a neologism. As the Seventh Circuit has noted, "Language often outpaces dictionaries." *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.,* 64 F.3d 1055, 1059 (7th Cir.1995) (Easterbrook, J.). Therefore, we cannot state that the absence of a definition in a particular dictionary conclusively proves that the general public does not use this neologism.

**23.** At oral argument, plaintiff's counsel argued that the use of the term WORLD BEAT is now passé and, therefore, should not be classified as generic. Our review of the record shows otherwise. WORLD BEAT's use is widespread on the Internet, in trade publications, and in at least one dictionary of recent vintage.

**24.** Our alternative holding that WORLD BEAT is a generic for a type of music does not eviscerate the trademark rights of Richards, CNN, or anyone else who uses the term WORLD BEAT in a manner other than to denote a specific genre of music. We do not by this holding eliminate Richards's right to use WORLD BEAT as a record label for pre-recorded reggae music, or the right to stop other record producers who attempt to use the same label for prerecorded music.

As Richards' Lanham Act claims have failed to show a likelihood of success on the merits, so must his common law claims and his claim under Pennsylvania's unfair competition statute also fail. Accordingly, we find that plaintiff has failed to meet the first requirement for a preliminary injunction, likelihood of success on the merits.

## II. *Irreparable Harm to the Plaintiff*

Even if we found that Richards was likely to succeed on the merits, he presented *no* evidence that CNN's use of the term WORLD BEAT would cause harm to his record label. We therefore have no basis for finding this factor in plaintiff's favor.

## III. *Irreparable Harm to CNN*

CNN has shown that our enjoining it from the use of the mark WORLD BEAT for its television show and Web site would cause irreparable harm. Mr. Cramer credibly testified that if CNN were forced to change the name of the television show it would create "severe embarrassment," N.T. 126, with the show's worldwide sponsor, Volvo, and would probably require the renegotiation of CNN's three-year contract with Volvo. Furthermore, Mr. Cramer testified that CNN had already done "considerable promotion and ... media hype", *id.*, to advertise the WORLD BEAT television show, and that any name change would cause viewer confusion.

## IV. *The Public Interest*

In his testimony, Mr. Richards called those who attempt to use the term WORLD BEAT in connection with the music industry "are all anarchists". N.T. 50. While plaintiff may regard our decision as blessing anarchy, we point out that a trademark is, in essence, a legalized monopoly. *See Standard Brands, Inc. v. Smidler,* 151 F.2d 34, 38 (2d Cir.1945) (Frank, J. concurring). To allow Richards any monopoly over the use of the term WORLD BEAT as it pertains to CNN's worldwide dissemination of news in the music industry would stifle the free expression of an important global voice. As noted in a case involving free speech on the Internet, "chaos and cacophony"—as well as expressive "anarchy" in broadcasting and on the World Wide Web—are precisely what the First Amendment protects. *ACLU v. Reno,* 929 F.Supp. 824, 883 (E.D.Pa.1996). The public interest is best served by denying plaintiff's motion for a preliminary injunction.

## ORDER

AND NOW, this 28th day of July, 1998, upon consideration of plaintiff's motion for a temporary restraining order and preliminary injunction, and defendant's opposition thereto, and after a hearing and upon the findings of fact and conclusions of law contained in the accompanying Memorandum, it is hereby ORDERED that the motion is DENIED.

Similarly, to the extent that CNN's use of the term WORLD BEAT is, in part, to denote a genre of music, but also to denote a music news program, it, too, may receive the protections of the trademark laws within CNN's orbit of use.

Instructive in this regard is McCarthy's analysis of *Lucasfilm, Ltd. v. High Frontier,* 622 F.Supp. 931 (D.D.C.1985), regarding the use of STAR WARS as a pejorative for President Reagan's "Strategic Defense Initiative." As McCarthy points out, "[s]ometimes a word used as a trademark comes to have an entirely new 'generic' meaning or usage apart from its function as a trademark. This occurrence has been described as 'the parallel development of new dictionary meanings in the everyday give and take of human discourse.' " 2 J. McCarthy, § 12:3, *quoting Murphy Door Bed Co. v. Interior Sleep Systems, Inc.,* 874 F.2d 95 (2d Cir.1989). Thus, regarding STAR WARS, McCarthy quotes with approval Judge Gesell's comment in *Lucasfilm* that:

[T]he use of star wars in political propaganda, newspapers or noncommercial, non-trade references will not undermine plaintiff's exclusive property right to use in connection with goods and services.... Now the phrase star wars has acquired a double meaning.... The new meaning of the phrase in the political context or scientific context does not affect the distinct, and still strong secondary meaning of STAR WARS in trade and entertainment.
*Id.* (quoting 622 F.Supp. at 935).